## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MARIE C. JIMENEZ,

        Plaintiff,

        v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

No. 13 C 5167

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Marie C. Jimenez filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on December 1, 2010, alleging that she became disabled on January 1, 2007, because of diabetes, fibromyalgia, sleep apnea, and myocardial infarction. (R. at 14, 73). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 14, 67–73, 76–82). On March 21, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 14, 32–66). The ALJ also heard testimony from Lee O. Knutson, a vocational expert (VE). (*Id.* at 14, 32–66, 120).

The ALJ denied Plaintiff's request for benefits on April 5, 2012. (R. at 14–26). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from January 1, 2011, her alleged onset date, through December 31, 2011, her date last insured (DLI).[2] (*Id.* at 16). At step two, the ALJ found that Plaintiff's insulin dependent diabetes mellitus, chronic bronchitis/asthma, hypertension, high cholesterol, mild degenerative disc disease, and fibromyalgia are severe impairments. (*Id.* at 16–19). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 19–20).

---

[2] The ALJ determined that Plaintiff last met the insured status requirements of the Act on December 31, 2011. (R. at 16). Therefore, Plaintiff must establish that she was disabled between January 1, 2007, and December 31, 2011, in order to qualify for benefits. *Bjornson v. Astrue*, 671 F.3d 640, 641 (7th Cir. 2012) ("only if [claimant] was disabled from full-time work by [her last insured] date is she eligible for benefits").

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that she can perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (R. at 20–25). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that through her DLI, Plaintiff was capable of performing past relevant work as a secretary, administrative assistant, and receptionist. (*Id.* at 25–26). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act, at any time from January 1, 2007, through December 31, 2011. (*Id.* at 26).

The Appeals Council denied Plaintiff's request for review on May 22, 2012. (R. at 1–4). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart,* 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin,* 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin,* 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. RELEVANT MEDICAL EVIDENCE

Plaintiff has suffered from depression and anxiety since 1999. (R. at 996). On September 17, 2007, Paul Glickman, M.D., Plaintiff's treating rheumatologist, observed that Plaintiff has long suffered from depression but has never taken antidepressants. (*Id.* at 760). Dr. Glickman noted that she cries easily during her visits. (*Id.*). He "strongly recommended" that Plaintiff have a formal psychiatric consultation. (*Id.*).

On November 10, 2007, Plaintiff presented to Evelyn Lacuesta, M.D., Plaintiff's endocrinologist, in an agitated state. (R. at 744). Plaintiff was "highly emotional, agitated and argumentative, . . . crying and blaming everyone for her disease." (*Id.*). Plaintiff "did not appreciate" Dr. Glickman's recommendation that she see a psychiatrist, but Dr. Lacuesta informed Plaintiff that she agreed with Dr. Glickman's assessment. (*Id.*). Dr. Lacuesta recommended that Plaintiff undergo psychological support or a psychiatric evaluation. (*Id.* at 745). On the way out of the clinic, Plaintiff swore profanities at Dr. Lacuesta's clerk and refused to take her appointment and lab slips. (*Id.*).

On January 26, 2011, Charles Carlton, M.D., performed an internal medicine consultative examination on behalf of the Commissioner. (R. at 976–80). Plaintiff described recent episodes of depression, suicidal ideation, and uncontrolled episodes of tearfulness. (*Id.* at 979). Her affect appeared flat, and she became tearful when describing her pain symptoms. (*Id.*). Plaintiff displayed some problems with immediate and remote memory. (*Id.*). Dr. Carlton diagnosed chronic pain syndrome and a

history of depression and recommended a full psychological consultative examination. (*Id.*).

On February 12, 2011, Christina M. Girgis, M.D., performed a psychiatric evaluation on behalf of the Commissioner. (R. at 996–1002). Plaintiff reported that she has been depressed for the last 11–12 years, with a "more severe, deep, dark depression" beginning four years ago. (*Id.* at 996). She feels constantly sad because of her physical illnesses and cries every single day, at least once. (*Id.*). Plaintiff cried during the evaluation. (*Id.* at 999). She denied panic attacks but gets anxiety attacks in stressful situations. (*Id.* at 996). She tries to "will herself out of" her depression, because she does not want to take any more medications.[4] (*Id.*). She expressed a general aversion to medications in general, stating that "she only takes her medications for diabetes because she could die." (*Id.* at 997). Plaintiff reported thoughts of wanting to hide or "check out of the world," and attempted suicide as a teenager, but denied any current suicidal ideations. (*Id.*). Both of Plaintiff's parents, her stepfather, and her two sons are all alcoholics. (*Id.*). Plaintiff's adult children, their spouses, and three grandchildren all live with Plaintiff and her husband, which Plaintiff characterizes as "crazy and stressful." (*Id.* at 998).

On a mental examination, Dr. Girgis found Plaintiff's affect to be restricted and her mental capacity limited: she was unable to name five large cities and could not

---

[4] Plaintiff reported that she was taking at least 14 different medications. (R. at 997).

perform serial three calculations.[5] (R. at 999–1000). Dr. Girgis diagnosed major depressive disorder, severe, recurrent, without psychosis, and assigned a Global Assessment of Functioning (GAF) score of 50.[6] (*Id.* at 1000). Dr. Girgis also observed that Plaintiff's severe depression is aggravated by her medical conditions, including obesity, diabetes, fibromyalgia, sleep apnea, and myocardial infarction, and her financial and family stressors. (*Id.* at 996, 997, 1000).

On March 3, 2011, Tyrone Hollerauer, Psy.D., a nonexamining DDS physician, completed a Psychiatric Review Technique form. (R. at 1003–15). Dr. Hollerauer relied on Dr. Girgis's and Dr. Carlton's examinations (*id.* at 1015) and concluded that Plaintiff has mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace (*id.* at 1013). Dr. Hollerauer found Plaintiff only partially credible, concluding that while Plaintiff "reports significant problems to [Dr. Girgis], she is able to relate well, is intact for memory and cognition, reports no [history] of hospitalization or psychiatric [therapy], has a 32-year-old intact marriage and is coopera-

---

[5] Serial threes, counting down by threes, "is a clinical test used to test mental function." <http://en.wikipedia.org/wiki/Serial_sevens>

[6] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM-IV*). A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV* at 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

tive and pleasant during [her] interview [with Dr. Girgis]." (*Id.* at 1015). Dr. Hollerauer opined that the severity of Plaintiff's condition reported by Dr. Girgis "is not supported either in the interview or by the rest of the evidence." (*Id.*). On May 11, 2011, Howard Tin, Psy.D., another nonexamining DDS physician, affirmed Dr. Hollerauer's assessment. (*Id.* at 1241–43).

Also on March 3, 2011, Plaintiff presented to Adamji Fakhruddin, M.D., for an unscheduled visit complaining that she was "very depressed." (R. at 1295). Dr. Fakhruddin diagnosed depressive disorder NOS. (*Id.* at 1296). He referred Plaintiff for exposure and response prevention (ERP) treatment.[7] (*Id.*). On July 28, 2011, Plaintiff complained of anxiety and angry feelings. (*Id.* at 1521).

On April 4, 2011, Plaintiff began treating with Monica M. Schwartz, LCSW. (R. at 1549). Plaintiff complained of feeling worthless and unable to cope. (*Id.*). Her medical and family issues are exacerbating her mental health. (*Id.*). Plaintiff's two adult sons—who abuse drugs and alcohol and don't work—along with their girlfriends and their children, all live in Plaintiff's single family home "and she can't get them out." (*Id.*). She agreed that therapy would be helpful but said she had very little money to pay for treatment. (*Id.*).

On April 23, 2011, Plaintiff complained of depression and family stressors. (R. at 1550). Plaintiff and her husband have tried many times to give their sons an ultimatum to move out of the house, but they won't move. (*Id.*). She agreed that thera-

---

[7] ERP "is a treatment method available from behavioral psychologists and cognitive-behavioral therapists for a variety of anxiety disorders."
<http://en.wikipedia.org/wiki/Exposure_and_response_prevention>

py was helping her cope but said she could not continue her treatment because of lack of funds. (*Id.*).

On September 22, 2011, Schwartz completed a mental impairment questionnaire. (R. at 1551–53). She described Plaintiff's signs and symptoms as poor memory, sleep disturbance, emotional lability, decreased energy, time or place disorientation, and difficulty thinking or concentrating. (*Id.* at 1551). Plaintiff is under extreme stress from her family issues. (*Id.*). She also reported that Plaintiff complained of drowsiness, dizziness, nausea, and pain. (*Id.*). Schwartz diagnosed dysthymic disorder[8] and assigned a GAF score of 50. (*Id.* at 1551). She concluded that Plaintiff's mental disorder is related to her "numerous medical conditions," including fibromyalgia and diabetes, and Plaintiff's treatment and prognosis is affected by family stressors from her two sons who abuse alcohol and drugs. (*Id.*).

Schwartz opined that Plaintiff is unable to remember work-like procedures, understand and remember very short and simple instructions, make simple work-related decisions, complete a normal workday and work week without interruptions from psychologically based symptoms, and respond appropriately to changes in a routine work setting. (*Id.* at 1552). She also opined that Plaintiff is seriously limited in her ability to carry out very short and simple instructions, maintain attention for a two-hour segment, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in co-

---

[8] Dysthymic disorder is characterized by "a chronically depressed mood that occurs for most of the day more days than not for at least 2 years." *DSM-IV* at 376.

ordination with or proximity to others without being unduly distracted, perform at a consistent pace without unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions. (*Id.*). Schwartz concluded that Plaintiff has a marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, constant deficiencies of concentration, persistence or pace, and continual episodes of deterioration or decompensation in work or work-like settings. (*Id.* at 1553).

At the hearing on March 12, 2012, Plaintiff testified that she is getting treatment for her anxiety from her primary care doctor. (R. at 52). Plaintiff's husband reported in March 2012 that Plaintiff has memory loss, is short tempered, cries every day, has cloudy thinking, and suffers anxiety attacks. (*Id.* at 211).

## V. DISCUSSION

### A. The RFC Did Not Properly Account for Plaintiff's Mental Impairment

The ALJ determined that Plaintiff's insulin dependent diabetes mellitus, chronic bronchitis/asthma, hypertension, high cholesterol, mild degenerative disc disease, and fibromyalgia are severe impairments. (R. at 16–19). The ALJ also concluded that Plaintiff's "medically determinable mental impairments of depression and anxiety, considered singly and in combination, did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and were there-

fore nonsevere." (*Id.* at 18). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform the full range of sedentary work.[9] (*Id.* at 20).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR)[10] 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R.

---

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[10] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

§ 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court concludes that the ALJ failed to fully consider the effects of Plaintiff's mental illness on her ability to work. The ALJ gave "great weight" to the opinions of the nonexamining DDS physicians (R. at 17) and concluded that Plaintiff's mild limitations "do not warrant any nonexertional mental limitations (*id.* at 25). Under the circumstances, the ALJ's decision to afford *no* nonexertional mental limitations is not supported by substantial evidence.

First, the ALJ erred by handpicking which evidence to evaluate while disregarding other critical evidence. *See Scrogham v. Colvin*, 765 F.3d 685, 696–99 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). From September 2007 through September 2011, Plaintiff was diagnosed with depression, chronic pain syndrome, depressive order NOS, major depressive disorder, and dysthymic disorder. (R. at 745, 760, 979, 1000, 1296, 1551). The ALJ ignores this evidence, highlighting instead an instance in September 2007 where Plaintiff "informed her doctor that she is not depressed." (R. at 17). Based on this single instance, the ALJ concluded that Plaintiff's "anxiety and depression [are] nonsevere mental impairments." (*Id.*). "But by cherry-picking [the medical file] to locate a single treatment note that purportedly undermines her overall assessment of [the claimant's] func-

tional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). As the Seventh Circuit has explained on numerous occasions, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Id.*

Furthermore, although Plaintiff denied depression, on September 17, 2007, Dr. Glickman observed that Plaintiff frequently cries during her visits. (R. at 760). Despite Plaintiff's protestations that she was not depressed, Dr. Glickman "strongly recommended" that she seek a formal psychiatric consultation. (*Id.*). Two months later, Plaintiff presented to Dr. Lacuesta in a highly emotional, agitated and argumentative state, crying and blaming everyone for her disease. (*Id.* at 744). Plaintiff complained to Dr. Lacuesta that she "did not appreciate" Dr. Glickman's recommendation that she seek psychiatric help. (*Id.*). But Dr. Lacuesta agreed with Dr. Glickman, recommending that Plaintiff *immediately* seek psychological support or a psychiatric evaluation. (*Id.* at 745).

While the ALJ acknowledges Plaintiff's history of anxiety and depression, she erroneously contends that Plaintiff did not seek treatment for either mental impairment. (R. at 16). On March 3, 2011, Dr. Fakhruddin diagnosed depressive disorder NOS and referred Plaintiff for ERP treatment. (*Id.* at 1296). In April 2011, Plaintiff treated with Schwartz, until she was unable to afford further treatment. (*Id.* at 1549–50). And in September 2011, Schwartz diagnosed a dysthymic disorder and opined that Plaintiff was significantly limited in her functional abilities. (*Id.* at

1551–53). Plaintiff testified that she continues to get treatment from her primary care doctor, who has prescribed Xanax. (*Id.* at 52–53).

The ALJ's reliance on the State agency consultants' evaluations is not supported by substantial evidence. The ALJ "assigned great weight to the opinions of Drs. Hollerauer and [Tin[11]] as they proved well supported by and consistent with the record evidence." (R. at 17). But the State agency consultants issued their evaluation without having reviewed significant medical evidence from Dr. Fakhruddin and Schwartz. Dr. Hollerauer erroneously stated that the consultative examination found Plaintiff's memory and cognition intact. (R. at 1015). While Dr. Girgis concluded that Plaintiff's memory was intact (*id.* at 998), Dr. Carlton a few weeks earlier found that she had problems with both immediate and remote memory (*id.* at 979). And Dr. Girgis found that Plaintiff's cognition was limited—she was unable to name five large cities and could not perform serial three calculations. (*Id.* at 998–99).

Dr. Hollerauer found Plaintiff's complaints of mental impairments only partially credible, in part because of her 32-year intact marriage. (R. at 1015). But Dr. Hollerauer failed to mention that the rest of Plaintiff's family is largely dysfunctional, causing constant stressors in Plaintiff's life. Both of Plaintiff's parents, her stepfather, and her two sons are all alcoholics. (*Id.* at 997). Plaintiff's adult children, their spouses, and three grandchildren all live with Plaintiff and her husband, which Plaintiff characterizes as "crazy and stressful." (*Id.* at 998).

---

[11] The ALJ refers to Dr. Tin as Dr. Lanier. (R. at 17).

The ALJ gave minimal weight to Schwartz's opinion, because it was based on only two sessions and only Plaintiff's self-reports. (R. at 17). If a "physician's opinion is . . . based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added). But here, Schwartz's opinion that Plaintiff had functional limitations was not a mere recitation of Plaintiff's self-reports but was also based on her observations of Plaintiff's signs and symptoms. (R. at 1549–51). And Plaintiff's self-report was necessarily factored into Schwartz's analysis as almost all diagnoses require some consideration of the claimant's subjective symptoms. *McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012) ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."); *see Flores v. Massanari*, 19 F. App'x 393, 402–03 (7th Cir. 2001) ("Any medical diagnosis necessarily must rely upon a patient's history and subjective complaints.").

The ALJ provides no detail for her conclusion that Schwartz's opinion was unsupported by the counseling notes. (R. at 17). In fact, Schwartz's written assessments "are much more extensive than the few sentences that Dr. [Hollerauer] offered to explain his conclusions to the effect that [Plaintiff] remained capable of some types of work." *Phillips v. Astrue*, 413 F. App'x 878, 884–85 (7th Cir. 2010) (the ALJ improperly granted too little weight to a physician's assistant's opinion where the only reasons given were that the opinion was inconsistent with and unsupported by treatment notes). The ALJ never identified what evidence contradicts

Schwartz's findings, and many of Schwartz's conclusions are corroborated by the assessments of Drs. Carlton and Girgis. During Dr. Carlton's consultative examination, Plaintiff described recent episodes of depression, suicidal ideation, and uncontrolled episodes of tearfulness. (R. at 979). Her affect appeared flat, and she became tearful when describing her pain symptoms. (*Id.*). Plaintiff displayed some problems with immediate and remote memory. (*Id.*). Dr. Carlton diagnosed chronic pain syndrome and history of depression and recommended a full psychological consultative examination. (*Id.*). The ALJ gave "great weight . . . to this highly qualified physician," who is "an expert in disability evaluation," and largely adopted his physical assessment. (*Id.* at 24). Nevertheless, the ALJ did not discuss Dr. Carlton's mental evaluation or explain why she was rejecting it.

Like Schwartz, Dr. Girgis noted that Plaintiff's physical ailments and extremely stressful family situation were exacerbating her mental illness. (*Compare* R. at 996, 997, 1000, *with id.* at 1551). Both Schwartz and Dr. Girgis assessed Plaintiff's GAF score at 50, and Schwartz's diagnosis of dysthymia is similar to Dr. Girgis's major depressive disorder diagnosis. Major depressive disorder is characterized by "decreased physical, social, and role functioning." *DSM-IV* at 371. Some people with major depressive disorder "have isolated episodes . . . , whereas others have clusters of episodes, and still others have increasing frequent episodes as they grow older." *Id.* at 372. Dysthymic disorder is characterized by "a chronically depressed mood that occurs for most of the day more days than not for at least 2 years." *Id.* at 376. "During periods of depressed mood, at least two of the following additional symp-

toms are present: poor appetite or overeating, insomnia, or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness." *Id.* at 377.

The ALJ erroneously concluded that because Plaintiff's GAF score "only reflects a specific moment in time and can change rather dramatically in a short period of time as [Plaintiff's] circumstances change, it is of very little value in determining disability." (R. at 17 n.1). While the American Psychiatric Association no longer uses the GAF metric, *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014), at the time of Plaintiff's psychological evaluations, clinicians still used GAF scores to indicate a "clinician's judgment of the individual's overall level of functioning." *DSM-IV* at 32. Here, Plaintiff's GAF score of 50 indicates moderate to serious symptoms, including suicidal ideations and serious impairment in social and occupational functioning. *DSM-IV* at 34. It's true that GAF scores are not *dispositive* of Plaintiff's disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that the GAF score does not necessarily reflect doctor's opinion of functional capacity because the score measures severity of both symptoms *and* functional level). Nevertheless, Plaintiff's GAF scores are *evidence* suggesting a far lower level of functioning than the ALJ assigned. *Yurt v. Colvin*, 758 F.3d 850, 859–60 (7th Cir. 2014) (Although the ALJ was not required to give any weight to individual GAF scores, "the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim,

which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC.").

The crux of the problem with the ALJ's opinion is that she ignored or minimized the views of the physicians and counselors who treated or examined Plaintiff and adopted the terse conclusions of the one doctor who had never met her. *See Phillips*, 413 F. App'x at 885 ("And that is the crux of the problem with the ALJ's decision. The ALJ did not simply discard the conclusions of [the physician's assistant]; rather, the ALJ's decision belittled the views of every medical professional who treated or examined Phillips and adopted the terse conclusions of the one doctor who had never met her."). The ALJ's conclusion that Plaintiff can perform the *full* range of sedentary work *without any* nonexertional limitations is not supported by substantial evidence. The medical evidence suggests that Plaintiff's depression and anxiety would cause at least *some* nonexertional limitations. *See Punzio*, 630 F.3d at 712 ("And the fact that Punzio is no longer suicidal and is not plagued by depression 24 hours a day says little about her abilities to understand and remember short instructions and to maintain attention for a two-hour segment."); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This pre-

vents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall seek appropriate expert medical advice to determine what effects Plaintiff's mental illnesses have on her ability to work. The ALJ shall then reassess Plaintiff's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted); *see Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) ("We keep telling the Social Security Administration's administrative law judges that they have to consider an applicant's medical problems in combination.") (collecting cases). The RFC shall be "expressed in terms of work-related functions" and include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. SSR 96-8p.

## B. Other Issues

Because the Court is remanding on the mental impairment issue, the Court chooses not to address Plaintiff's other arguments. Nevertheless, on remand, after fully considering the effect of Plaintiff's mental illness on her ability to work, the ALJ shall reassess the weight to be given to Dr. Glickman's opinion. If the ALJ finds "good reasons" for not giving Dr. Glickman's opinion controlling weight, *see*

*Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "consider the length, nature, and extent of the treating relationship, frequency of examination, the physician's specialty, they types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining the weight to give Dr. Glickman's opinion. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there were jobs that existed in significant numbers that Plaintiff could have performed through the date last insured.

# VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings is **GRANTED**, and Defendant's Motion for Summary Judgment [21] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: April 6, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge